**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JEANNETTE ALMODOVAR, | : | |
| Plaintiff, | : | CIVIL CASE NO. |
| | : | 3:20-CV-01179 (JCH) |
| v. | : | |
| | : | |
| CROSS FIN. CORP., | : | |
| Defendant. | : | JUNE 2, 2022 |
| | : | |

**RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 25)**

**I.    INTRODUCTION**

Plaintiff Jeannette Almodovar originally brought this action in the Superior Court of Connecticut, alleging three discrimination claims under state law based on the termination of her employment.  See Compl. (Doc. No. 1-1).  Defendant Cross Financial Corporation ("Cross") proceeded to notice the removal of the case to this court.  See Notice of Removal (Doc. No. 1).  All three counts in Almodovar's Complaint arise under the Connecticut Fair Employment Practices Act ("CFEPA") and stem from Cross' decision to terminate her employment in July 2019.  Compl. at ¶ 54.  Almodovar alleges that, in letting her go, Cross discriminated against her on the basis of her race, in Count One; on the basis of her national origin, in Count Two; and on the basis of her gender, in Count Three.  Id. at ¶¶ 68-85.

Cross has moved for summary judgment on all three claims.  See Mot. for Summ. J. (Doc. No. 25); Mem. of Law in Supp. of Mot. for Summ. J. ("Def.'s Mem.") (Doc. No. 26); Def.'s Reply to Pl.'s Objection to Mot. for Summ. J. ("Def.'s Reply") (Doc. No. 33).  Almodovar opposes that Motion.  See Pl.'s Mem. of Law in Supp. of Objection to Def.'s Mot. for Summ. J. ("Pl.'s Mem.") (Doc. No. 30-1).

1

For the reasons stated below, the court denies defendant's Motion for Summary Judgment.

## II.    FACTS[1]

In 2018, plaintiff Almodovar applied for a job opening with an insurance agency in New Caanan, Connecticut, that was owned and operated by defendant Cross.  Def.'s Local R. 56(a)1 Statement at ¶¶ 2-3 ("Def.'s R. 56(a)1 Stmt") (Doc. No. 27); Pl.'s Local R. 56(a)2 Statement at ¶¶ 2-3 ("Pl.'s R. 56(a)2 Stmt") (Doc. No. 30-2).  Almodovar "identifies as a Hispanic, Puerto Rican female with young children", and lives in Bridgeport, Connecticut.  Def.'s R. 56(a)1 Stmt at ¶ 1; Pl.'s R. 56(a)2 Stmt at ¶ 1.  After applying for the position at the suggestion of an acquaintance who was also a Cross employee, she had a series of interviews and phone conversations with Tim Brown, a Caucasian male, who is the Branch Manager of the New Canaan agency.  Def.'s R. 56(a)1 Stmt at ¶¶ 3-4; Pl.'s R. 56(a)2 Stmt at ¶¶ 3-4.  In June 2018, she was offered the position and accepted it.  Def.'s R. 56(a)1 Stmt at ¶ 4; Pl.'s R. 56(a)2 Stmt at ¶ 4.

When he hired Almodovar, Brown "was fully aware that [she] was Spanish/Latino and a female with young school age children."  Def.'s R. 56(a)1 Stmt at ¶ 5; Pl.'s R. 56(a)2 Stmt at ¶ 5.  Indeed, Brown and Almodovar even worked out an arrangement for her to start work at 9:30 AM so that she could attend to her children, rather than the standard 8:30 AM start time for the office.  Def.'s R. 56(a)1 Stmt at ¶ 6; Pl.'s R. 56(a)2 Stmt at ¶ 6.  Almodavar's salary was also $97,000, which made her the highest paid Account Manager at the agency.  Def.'s R. 56(a)1 Stmt at ¶¶ 7-8; Pl.'s R. 56(a)2 Stmt at

---

[1] The court draws primarily from the parties' Local Rule 56(a) statements and supporting exhibits in summarizing the material facts, construing those facts in the light most favorable to Almodovar.

¶¶ 7-8.  When she began working for Cross, Almodovar "was given training for several months with the Account Manager she was replacing."  Def.'s R. 56(a)1 Stmt at ¶ 9; Pl.'s R. 56(a)2 Stmt at ¶ 9.  That training was adequate for her to adapt to the position, which included "handling a book of business, servicing accounts, rounding out accounts, cross-selling, reviewing gaps in coverage, processing endorsements, binding new business coverage, providing insurance quotes and communicating with customers through phone calls and emails."  Def.'s R. 56(a)1 Stmt at ¶¶ 9-10; Pl.'s R. 56(a)2 Stmt at ¶¶ 9-10.

According to Almodovar, there were several incidents during her time at Cross that led her to believe her termination was due to discrimination on the basis of race, national origin, and gender.  The first was Cross' failure to add her to its website.  When Almodovar was hired, two of her similarly situated colleagues had professional photographs featured on the agency's website.  Pl.'s Ex. 1, Dep. of Jeannette Almodovar at 43 (Doc. No. 30-4).  Almodovar, however, testified that her photo was never added.  Id. at 44.  Yet when she checked the website a week after she was let go, she averred that the company had added a photograph of the new, Caucasian female employee they had just hired.  Def.'s Ex. A, Dep. of Jeannette Almodovar, Vol. II, at 59-60 (Doc. No. 26-1).[2]  Although she concedes that, for at least some period while she was employed, the website "was down, and so that's why they couldn't put my information in there", she still asserts that the failure to add her photograph was part of

---

[2] Both plaintiff and defendant have submitted excerpts from Almodovar's deposition.  Because the two filings include different pages from that deposition, the court specifies which document it is citing to throughout this Ruling.  In addition, defendant's submission includes both Volume I and Volume II of the deposition, and the court cites accordingly.

what "cause[d] [her] to believe [she was] discriminated against based on [her] . . . race [and] national origin as Hispanic/Latino."[3]  Id. at 42; 59-60.

Second, Almodovar stresses the fact that, in 2019, Cross purchased new office space, which was then shown to all the other employees except for her.  Id. at 39-41. Although she never directly asked to see the new space, she testified that Brown had told her that eventually they would take her to see it.  Id. at 40.  She also "guess[ed]" that the other employees were taken to see the office around 8-8:30 AM because "[she] was not in the office yet."  Id. at 40-41.  In his deposition, Brown confirmed that Almodovar never asked to see the new office, and that he had shown the space to the other employees only after they had asked.  Dep. of Tim Brown at 55-56, 120.

Third, Almodovar argues that Cross "unequally enforce[ed] the dress code policy" to her detriment.  Pl.'s Mem. at 21.  In particular, she highlights "that on one occasion when she wore blue jeans, she was told they were not allowed."  Def.'s R. 56(a)1 Stmt at ¶ 15; Pl.'s R. 56(a)2 Stmt at ¶ 15.  This was despite the fact that, in Brown's own words, the dress code was "very casual" and he himself would occasionally wear flip-flops and shorts in the office.  Dep. of Tim Brown at 29-30.  Because she was treated differently from other white employees – that is, Cross enforced the dress code against her but not against them – Almodovar testified that Cross' actions were "absolutely discriminatory based on me being a woman, based on my being Spanish potentially, based on me being singled out when everyone else was doing what they wanted to do."

---

[3] Brown, for his part, testified that the reason Almodovar's photograph was never added to the website was that "we didn't make any changes to that website for probably – I can't tell you the timeline when it was.  We wanted to get a new website at some point in time.  So, no changes were made; no additions were made as of a certain time."  Def.'s Ex. B, Dep. of Tim Brown at 59 (Doc. No. 26-2).

Def.'s Ex. A, Dep. of Jeannette Almodovar, Vol. II, at 24.  However, she also testified

that no one said the reason she could not wear jeans was related to her gender, race,

or national original, although she also testified that, because she was singled out, the

connection was "implied."  Id. at 24-25.

Other than these three incidents, the parties agree that Almodovar generally "got

along with her co-workers and did not have any conflicts with them . . . . [She] never

complained of any treatment that she believed to be discriminatory based on her race,

national origin or gender during her entire tenure", and "[h]er co-workers did not make

any comments to her that she perceived to be discriminatory."  Def.'s R. 56(a)1 Stmt at

¶ 11; Pl.'s R. 56(a)2 Stmt at ¶ 11.  Still, plaintiff argues that "this evidence cannot be

viewed in isolation."  Pl.'s Mem. at 21.  In particular, she stresses additional

circumstances surrounding the termination of her employment that she argues are

probative of Cross' discriminatory intent.  Id.

Leading up to her termination on July 30, 2019, Almodovar testified she had no

idea that Cross had any issues with her work performance.[4]  Pl.'s Ex. 1, Dep. of

Jeannette Almodovar at 51-52 ("[i]n the whole time I've worked there there was never a

discussion about me not meeting expectations").  During her time at the agency, she

had several meetings with her superiors where – according to her – they never

mentioned any work deficiencies.  She had an end of the year meeting with Brown and

Scott Cluett, the office manager, in December 2018, where they told her she "was doing

---

[4] Defendant disputes this claim, pointing to Brown's testimony that, "'[p]rior to termination there w[ere] discussions with [Almodovar] along the way that she needed to improve certain things.'"  Def.'s R. 56(a)1 Stmt at ¶ 21 (quoting Dep. of Tim Brown at 71 and detailing several other discussions Brown testified about in his deposition).  The court must, however, accept plaintiff's version of these events for the purposes of this Motion.

fine."  Id. at 12; Compl. at ¶ 31; Def.'s Answer and Affirmative Defenses at ¶ 31 ("Def.'s

Answer") (Doc. No. 13).  That meeting involved "a self-review" of her performance and

how she "interpreted how [she] was doing versus what they thought."  Pl.'s Ex. 1, Dep.

of Jeannette Almodovar at 12.  During that meeting, Almodovar testified that she was

not given any suggestions for improvement, not told her performance was deficient in

any way, and came away from it thinking "[e]verything was fine" because "there was

nothing negative in that meeting."  Id. at 12-14.  Indeed, at the end Brown said

something along the lines of "keep up the good work. You're doing great."  Id. at 14.

In March 2019, Almodovar had a second meeting with Cluett and John Bova, the

Vice President of Operations.[5]  Id. at 16; Compl. at ¶ 33; Def.'s Answer at ¶ 33.

According to her, this meeting was not about her performance at all; rather, it was about

her 9:30 AM start time.  Pl.'s Ex. 1, Dep. of Jeannette Almodovar at 17.  "The discussion

was very brief", no longer than five minutes, and Cluett and Bova discussed with her

"[h]ow it was unfair that other employees [were] there at 8:30, and [she was] arriving at

9:30."  Id. at 16-17, 28.  After she explained to both men the agreement she and Brown

had come to before she took the job, "[t]hey said they weren't aware of that information

and [ ] they apologized."  Id. at 16.  She also had a third meeting in March, "a review"

with Brown, Cluett, and Bova.  Id. at 28.  At that meeting, it was Cluett who did most of

the talking and, according to Almodovar, the tone of the meeting "was just kind of

seeing if [she had] any questions."  Id. at 29.  Cluett did ask her if she was getting along

---

[5] In her Memorandum, Almodovar refers to this meeting as occurring in May 2019 not March.
Pl.'s Mem. at 4.  In her deposition, Almodovar could not recall the exact date of the meeting, and testified
as to both dates.  Compare Def.'s Ex. A, Dep. of Jeannette Almodovar, Vol. II, at 16, with id. at 36-38.
The court notes the discrepancy, but otherwise uses the March date as it appears from elsewhere in her
testimony that both the second and third meetings discussed here occurred in March.  Pl.'s Ex. 1, Dep. of
Jeannette Almodovar at 28.  The court also notes that the exact dates of those meetings is not material.

with her co-workers, specifically mentioning Cheryl Eckert.  Id.  After she responded by saying "[o]f course.  Why?", they said "[n]o, no reason in particular."  Id.

Thus, given the lack of any notice regarding deficiencies in her work product,[6] it came as quite a surprise to Almodovar when she was called into a meeting on July 30, 2019, and terminated.  Nor was she given much explanation for why she was being let go.  According to her, "[t]hey told me I wasn't a good fit", id. at 26, and nothing more.  "Maybe there were a pile of reasons [for] why I wasn't a good fit", she speculated, "but they told me that that was the only reason, and I asked why, because my review was great [ ] and they said, 'You're just not a good fit.'"  Id. at 26-27.  To Almodovar, the lack of specificity and vague references to fit amounted to a "non-explanation of why [she] was let go."  Id. at 56.  Brown, who both hired and fired her, averred that the reason she was not a good fit was because of her deficient performance.  "During her tenure, [he] observed numerous instances throughout her employment where in [his] opinion she made mistakes in providing information to customers, communicated poorly with customers, did not provide timely or accurate information, did not document phone calls or communications, made errors in processing matters and did not take timely and necessary action on client requests."  Aff. of Tim Brown at ¶ 5.  In addition to his own observations, he also relied on input from Cluett and Bova in deciding to terminate Almodovar.  Id. at ¶ 8.

---

[6] Again, the court notes that defendant disputes that Almodovar was never told that her work needed to improve.  In his Affidavit, Brown stated that, although he "did not formally discipline her", he "chose to follow an approach where we would talk to her and look for improvement."  See Aff. Of Tim Brown at ¶ 6.  Again, the court takes the evidence in the light most favorable to Almodovar, the non-movant.

Again, taking the evidence in the light most favorable to Almodovar, she was not told that her work product was deficient or that she was not a good fit until the day she was terminated.  Almodovar testified that she was never put on notice of what the company believed she was doing wrong.  She argues, therefore, that in terminating her employment, Cross ran afoul of its progressive discipline policy.  That policy outlines five escalating steps that, when followed sequentially, "provide[ ] employees with notice that areas of job performance need improvement and establish[ ] procedures for conveying recommendations and setting goals for making such improvements."  See Pl.'s Ex. 4 (Doc. No. 30-7).  In order, the five steps of Cross' progressive policy include: (1) one or more verbal warnings; (2) one or more written warnings; (3) a performance improvement plan; (4) a final written warning and/or suspension without pay, and; (5) termination.  Id.  In the policy, however, Cross explicitly "reserves the right to combine, skip or add steps . . . on a case-by-case basis.  Th[e] policy is not a guarantee of treatment and does not alter the at-will nature of an employee's employment."  Id.  Indeed, "[w]hen warranted, the company may terminate the employment relationship without prior notice or disciplinary action under th[e] policy."  Id.

Still, Almodovar points to the case of another employee, Janet Porter, as evidence that the progressive discipline policy was unevenly followed.  Whereas Almodovar testified that she was never informed of any performance deficiencies, even informally, the parties do not dispute that Porter was informed of performance deficiencies.  Def.'s R. 56(a)1 Stmt at ¶ 23; Pl.'s R. 56(a)2 Stmt at ¶ 23.  Porter had performance issues regarding phone communications with clients and emails, which she would often send out with lots of errors and typos.  Aff. of Tim Brown at ¶ 7; Dep. of

Tim Brown at 43.  After Brown and other managers spoke with her about these issues, she improved over time and as such Brown did not take any further action.  Id.

In her Memorandum, Almodovar argues that Brown's treatment of Porter is evidence that he used the progressive discipline policy as to Porter but not as to her. Pl.'s Mem. at 15-20.  Brown's testimony, however, is less clear cut.  Although he did concede that he used the policy as to Porter, he said in the same breath that he used it for Almodovar as well.  Dep. of Tim Brown at 86.  However, Brown expressed uncertainty as to whether the conversations he testified about having with Porter and Almodovar regarding their performance deficiencies qualified as actions under the policy.  Id. at 81.  Initially, he testified that he had used only the first step of the policy – verbal warnings – with them.  Id.  But he quickly backtracked:

> Let me strike that for a second.  Warnings.  I don't – there's different text of warnings [sic].  We don't discipline people there as much as we try to encourage it and help with the performance.  So, if a verbal warning means in this case the interpretation that you're subject to termination, then, no [I was not using the policy when I spoke with them].  That's not what we did here.  And I'm not sure if that's what [the policy] actually means.  There were verbal discussions.  Let me put it that way.  There were verbal discussions but not warnings, per se.[7]

Id.  Even assuming that his conversations with Porter amounted to a use of the progressive discipline policy, it never went beyond the first step, largely due to the fact that Porter's performance eventually improved.  Def.'s R. 56(a)1 Stmt at ¶ 23.  In contrast, Almodovar testified that she was never given any verbal notice about her performance deficiencies and thus argues that the policy was never applied to her.  Pl.'s

---

[7] Later on in his deposition, Brown continued to "get[ ] hung up on the word 'warnings.'  Id. at 84. "I'm very casual here", he explained.  Id. at 82.  "It's not a discipline situation . . . . It was more or less you need to improve in certain areas . . . . [Almodovar] was spoken to along the way about her performance and the fact she needed to improve her performance.  If that means one or more verbal warnings, then that would qualify for number one."  Id.

Mem. at 16.  Shortly after terminating Almodovar's employment, Cross hired Stacy

Turiano as an Account Manager.  Pl.'s Additional Material Facts at ¶ 6 (Doc. No. 30-2).

Turiano was not Hispanic; she did not have young kids; and she was able to start work

at 8:30 A.M.  Id.

## III.    STANDARD OF REVIEW

A Motion for Summary Judgment will be granted if the record shows "no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of establishing

the absence of a genuine dispute of material fact.  Celotex Corp. v. Cartrett, 477 U.S.

317, 323 (1986).  The non-moving party may defeat the motion by producing sufficient

specific facts to establish that there is a genuine issue of material fact for trial.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).  A genuine issue of

material fact exists where the evidence is such that a reasonable jury could decide in

the non-moving party's favor.  See, e.g., Biondo v. Kaledia Health, 935 F.3d 68, 73 (2d

Cir. 2019) (citing Anderson, 477 U.S. at 248)).

## IV.   ANALYSIS

Almodovar has brought three claims in this case, all under the CFEPA.  In Count

One, she alleges that Cross discriminated against her on the basis of her race.  In

Count Two, she alleges she was discriminated against because of her national origin,

and in Count Three, she alleges gender discrimination.  Cross has moved for summary

judgment on all three of these claims.

A.    The McDonnell Douglas Standard

As both parties acknowledge, CFEPA claims are analyzed under the same

McDonnell Douglas burden-shifting framework as claims under federal discrimination

statutes.  Id. at 17-18; Pl.'s Mem. at 12; see also Kaytor v. Electric Boat Corp., 609 F.3d 537, 556 (2d Cir. 2010) ("[t]he analysis of discrimination . . . claims under CFEPA is the same as under Title VII"); Toro v. Arnold Foods Co., Inc., 620 F. Supp. 2d 288, 292 n. 5 (D. Conn. 2009) (analyzing plaintiff's Title VII and CFEPA race and national origin claims together under McDonnell Douglas).  In order to prevail on her claims, Almodovar must first meet her initial burden of establishing a prima facie case that she was discriminated against on the basis of her race, national origin, and gender.  Toro, 620 F. Supp. 2d at 292.  "Once the prima facie case has been established, the burden shifts to the employer to offer a legitimate non-discriminatory reason for the discharge." Phalon v. Avantor Inc., No. 19-CV-00852, 2021 WL 4477404, at *8 (D. Conn. Sept. 30, 2021) (internal quotations and citations omitted) (emphasis added).  "If [the] defendant[ ] [is] able to do so, the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext" for discrimination.  Id. (internal quotations and citations omitted).

        "Establishing a prima facie case of discrimination is not a demanding burden." Id. (internal quotations and citations omitted) (emphasis added).  Here, it requires showing that Almodovar: "(1) is a member of a protected class; (2 was performing h[er] duties satisfactorily; and (3) was discharged; (4) in circumstances supporting an inference of discrimination on the basis of h[er] membership in the protected class." Toro, 620 F. Supp. 2d at 292-93 (citing Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000)).  At this stage, the Second Circuit has characterized the "plaintiff's prima facie burden as 'minimal' and 'de minimis.'"  Woodman v. WWOR-TV, Inc., 411 F.3d 69, 76 (2d Cir. 2005) (quoting Zimmerman v. Assocs. First Capital Corp., 251 F.3d 376, 381

(2d Cir. 2001)).  For instance, the "required inference of discrimination" can be satisfied at the <u>prima facie</u> stage by "the mere fact that a plaintiff was replaced by someone outside the protected class."  <u>Zimmerman</u>, 251 F.3d at 381; <u>see also</u> <u>Littlejohn v. City of New York</u>, 795 F.3d 297, 312-13 (2d Cir. 2015) (noting that "an inference of discrimination also arises when an employer replaces a terminated or demoted employee with an individual outside the employee's protected class" and holding that an allegation from a former black employee that she was replaced by a white employee was sufficient at the pleading stage to allege a plausible claim of discrimination).  "A plaintiff may [also] raise such an inference" at this stage "by showing that the employer subjected her to disparate treatment by treating her 'less favorably than a similarly situated employee outside [her] protected group.'"  <u>Martel v. New England Home Care, Inc.</u>, No. 09-CV-1412, 2014 WL 3687738, at *9 (D. Conn. July 22, 2014) (quoting <u>Graham</u>, 230 F.3d at 39).  Here, because Almodovar has brought forth evidence upon which a reasonable jury could conclude both that (i) she was replaced by a non-Hispanic female without young children, and (ii) that she was treated less favorably than Porter, a similarly situated non-Hispanic female without young children, she has met her initial burden of establishing a <u>prima facie</u> case of discrimination.[8]

"Once a <u>prima facie</u> case has been established, the burden shifts back to the defendant in step two of the <u>McDonnell Douglas</u> analysis."  <u>Weiss v. Quinnipiac Univ.</u>, No. 20-CV-00375, 2021 WL 4193073, at *4 (D. Conn. Sept. 15, 2021) (emphasis

---

[8] Although Almodovar, Turiano, and Porter are all female, Almodovar argues that a "sex plus" framework should be applied to her gender discrimination claim.  <u>See</u> Pl.'s Mem. at 21-22.  In other words, she argues that she was not discriminated against solely on the basis of being a woman; instead, she was discriminated against because of her status as a woman with young children.  <u>Id.</u>  For the reasons discussed below, <u>see infra</u> at 14 n. 9, the court agrees and, as such, applies that framework here.

added).  At this stage, "the employer [must] articulate a legitimate, non-discriminatory reason for the employee's termination."  Toro, 620 F. Supp. 2d at 293-94.  "This is also not a high standard.  Indeed, [t]he defendant need not persuade the court that it was actually motivated by the proffered reason[ ].  It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff."  Weiss, 2021 WL 4193073, at *4 (internal quotations and citations omitted); see also Martel, 2014 WL 3687738, at *12 ("[t]he [employer's] burden at this stage 'is one of production, not persuasion; it can involve no credibility assessment'") (quoting Reeves v. Sanderson Plumbing Products, Inc., 509 U.S. 502, 507 (1993).  In other words, "[t]he defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action."  Id. (emphasis in original) (internal quotations and citations omitted).  "If the defendant succeeds in producing evidence of a legitimate, non-discriminatory reason" – such as deficient work performance – then "the presumption raised by the prima facie case is rebutted and drops out of the case."  Id. (emphasis added).  Cross has met that burden here, asserting that Almodovar was terminated for her deficient work performance.

"Once this has occurred, the burden shifts back to the plaintiff for the final step of the analysis."  Weiss, 2021 WL 4193073, at *5.  At this stage, the plaintiff must "'prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'"  Martel, 2014 WL 3687738, at *13 (quoting St. Mary's Honor Ctr. V. Hicks, 509 U.S. 502, 515 (1993).  "'[A] reason cannot be proved to be "a pretext for discrimination" unless it is

13

shown <u>both</u> that the reason was false, <u>and</u> that discrimination was the real reason.'"  <u>Id.</u>

(quoting <u>Hicks</u>, 509 U.S. at 515) (emphasis in original).  Thus, to defeat summary

judgment, a plaintiff must "point to . . . evidence sufficient to permit a rational trier of fact

to conclude both that": (1) defendant's "proffered reason was false,[9] and"; (2) "that

discrimination was the real reason h[er] employment was terminated."  <u>Phalon</u>, 2021

WL 4477404, at *9 (internal quotations and citations omitted).

       B.    <u>Pretext for Discrimination</u>

      In her Memorandum, Almodovar makes four principal arguments as to why

Cross' proffered reason for her termination – namely, her deficient work performance –

was a pretext for discrimination.  First, she highlights Cross' failure to follow its

progressive discipline policy before letting her go.  Pl.'s Mem. at 15-17.  Second (and

relatedly), she argues that she was treated differently from both Porter as the agency

dealt with their performance issues, and from her other colleagues due to the comment

regarding her jeans and the failure to put her photo on the website or show her the new

office space.  <u>Id.</u> at 5-6; 17-18, 21.  Third, she argues that, because Brown's testimony

regarding his reasons for terminating Almodovar was "vague and subjective", the lack of

specificity is also "evidence of pretext.  <u>Id.</u> at 18-20.  Finally, she argues that even if

none of the first three pieces of evidence in isolation are sufficient to demonstrate

pretext, the totality of the record evinces that discrimination was the real reason for her

---

[9] Considering the facts in the light most favorable to Almodovar, she has introduced facts into the record upon which a reasonable jury could conclude that Cross' proffered reason for her termination was false.  She testified that she was never told her work performance was deficient and, indeed, that she was performing well.  Pl.'s Ex. 1, Dep. of Jeannette Almodovar at 12-14.  This is sufficient to satisfy this first part of the pretext analysis, as assessing "conflicting portrayals of [a plaintiff's] job performance are jury functions, not those of a judge."  <u>Rodrigues v. Conn. Container Corp.</u>, No. 3:20-CV-00294, 2022 WL 844610, at *7 (D. Conn. Mar. 22, 2022) (internal quotations and citations omitted).

termination.[10]  Id. at 21.  Although none of her first three arguments is sufficient standing

alone to defeat summary judgment, the court concludes that a reasonable jury,

weighing the record as a whole, could conclude that Cross' proffered reason for her

termination was mere pretext for discrimination.

>    1.    Progressive Discipline Policy

Almodovar first argues that "[w]hen an employer opts to have a disciplinary

system that involves warnings, failure to follow that system permits the inference of

pretext."  Pl.'s Mem. at 15.  In support of this argument, she relies on Stern v. Trs. Of

Columbia Univ., 131 F.3d 305 (2d Cir. 1997), a case where the Second Circuit found

---

[10] Almodovar also argues that the court should apply the "sex plus" framework to her gender discrimination claim, contending that she "need not establish that [Cross] discriminated against [all women]; instead, [she] need only establish that [Cross] treated a subclass of . . . women (those with the plus characteristic) differently from those without the plus characteristic."  Pl.'s Mem. at 22.  Here, the "plus characteristic" in question is having young children.  Id.  Contrary to defendant's argument in its Reply, see Def.'s Reply at 10-11, the Second Circuit has recognized that "sex plus" claims are permissible in Title VII actions.  See Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 118-19 (2d Cir. 2004) (finding the argument that a "sex plus" claim could not proceed in a § 1983 action to be "without merit" because "[t]he term 'sex plus' or 'gender plus' is simply a heuristic.  It is, in other words, a judicial convenience developed in the context of Title VII to affirm that plaintiffs can, under certain circumstances, survive summary judgment even when not all members of a disfavored class are discriminated against.  Although we have never explicitly said as much, 'sex plus' discrimination is certainly actionable in a § 1983 case . . . .  The relevant issue is not whether a claim is characterized as 'sex plus' or 'gender plus', but rather, whether the plaintiff provides evidence of purposefully sex-discriminatory acts").

In bringing a "sex plus" claim, a plaintiff must show "that it was not simply their gender that caused the discrimination, but rather it was their gender in combination with another characteristic that caused the employer to illegally discriminate."  14 Conn. Prac., Employment Law § 7:8, Sex Discrimination.  For example, the Second Circuit has indicated that treating widowers less favorably than widows (or vice versa) could, "in the Title VII context . . . [be] called a 'sex plus marital status' claim."  Back, 365 F.3d at 119 n. 9.  Another example could be "an employer who filled a particular position 75 to 80 percent of the time with women.  It, however, refused to accept applications from women with pre-school-age children, although it hired men with children the same age."  14 Conn. Prac., Employment Law § 7:8, Sex Discrimination (summarizing the facts in Phillips v. Martin Marietta Corp., 400 U.S. 542 (1971), in which the Supreme Court endorsed what was effectively a "sex plus" action, albeit without using that exact term).

Given these examples from the Supreme Court and the Second Circuit, this court respectively disagrees with Judge Burns' holding in Guglietta v. Meredith Corp., 301 F. Supp. 2d 209 (D. Conn. 2004), cited by defendants, that "'child-rearing is not a sex-plus characteristic protected by Title VII.'"  Def.'s Reply at 11 (quoting Guglietta, 301 F. Supp. 2d at 214).

that an employer's "unprecedented . . . deviation from its usual procedure[s]", in conjunction with other evidence in the record, could allow a reasonable jury to conclude that the employer's proffered reason was pretext for discrimination.  Stern, 131 F.3d at 312-14.  Stern and its progeny, however, invariably point not only to the failure to follow established procedures, but to other evidence in the record as well to conclude that a jury could find that an employer's proffered reason was mere pretext. In other words, simply deviating from company policy – absent anything more – is not enough.[11]

For instance, in Stern the deviation from the employer's hiring procedures was but one factor in the court's analysis.  There, the evidence in the record was also sufficient for a jury to conclude that: (1) the university actually preferred to hire a candidate of a certain race and gender; (2) they initially attempted to circumvent their hiring process entirely by "giv[ing] the position summarily" to someone of that race and gender; (3) they then appointed an "atypical committee", the majority of which were "not competent to assess crucial skills of [the] candidates" they were interviewing and considering, and; (4) the university then hired someone of their preferred race after a process that "the University's ombuds officer characterized as 'unusual rapidity.'"  Id. at 312-13.

---

[11] Almodovar also cites two Fifth Circuit cases in support of this argument, both of which are inapposite here because they are distinguishable and not binding on this court.  Pl.'s Mem. at 15.  In Machinchick v. PB Power, Inc., 398 F.3d 345 (5th Cir. 2005), the court held that a company's failure to follow its termination procedures could be used to demonstrate pretext when the "company policy specifically stat[ed] that it should be 'followed in most circumstances.'"  Machinchick, 398 F.3d at 354 n. 29.  Here, however, Cross' progressive discipline policy is explicitly optional.  See Pl.'s Ex. 4.  The second case she cites, Feist v. Louisiana, Dep't of Justice, Office of the Atty. Gen., 730 F.3d 450 (5th Cir. 2013), is even more readily distinguishable.  In the pages Almodovar cites to, the court there discusses "an employer's departure from typical policies and procedures" primarily in the context of establishing a prima facie case for a retaliation, not a discrimination, claim.  Feist, 730 F.3d at 455.  The court went on to conclude that granting summary judgment on plaintiff's retaliation claim was warranted because she had not met her burden of demonstrating pretext. Id.

Similarly, cases following <u>Stern</u> in this Circuit have continued to require that a failure to follow established company policies be coupled with other evidence of pretext before denying motions for summary judgment.  Indeed, the Second Circuit has been clear that, "[w]hile it is true that [d]epartures from procedural regularity . . . can raise a question as to the good faith of the process", a plaintiff must show more than mere deviation to survive summary judgment.  <u>Bickerstaff v. Vassar College</u>, 196 F.3d 435, 453 (2d Cir. 1999).  A plaintiff must also show that the "procedural irregularity . . . was race-related" or otherwise motivated by discrimination.  <u>Id.</u> at 453-54.  District Courts in this Circuit have consistently applied this rule.  <u>See, e.g.</u>, <u>Bunting v. Kellogg's Corp.</u>, No. 3:14-CV-00621, 2016 WL 5799291, at *6 (D. Conn. Sept. 30, 2016) (observing that simply showing there were procedural irregularities in a hiring process is not by itself enough, as "the procedural irregularities must <u>themselves</u> contribute to the implication of discrimination in order for the plaintiff to survive summary judgment" and holding that even if plaintiff could show such procedural irregularities in that case "a reasonable jury could not, without further evidence, infer that [the employer's decision to deviate from its procedures was] motivated by [plaintiff's] race") (emphasis added); <u>Riccobono v. Crew</u>, No. 00-CV-5386, 2010 WL 11602749, at *10 (E.D.N.Y. Sept. 10, 2010) (discussing <u>Stern</u> by noting that "there was significant other evidence in <u>Stern</u> from which the inference of discrimination . . . could be drawn . . . . The bypass of procedural regularities, in other words, strengthened other evidence that was already pointing in the direction of discrimination.  Here, however, Plaintiff has no evidence pointing towards race discrimination, and the procedural irregularities do not do so by themselves"); <u>Rodrigues v. Conn. Container Corp.</u>, No. 3:20-CV-00294, 2022 WL

844610, at *5-6 (D. Conn. Mar. 22, 2022) (denying summary judgment where there was both a strong temporal proximity between plaintiff's disclosure of his medical condition to his employer and his termination and the employer failed to follow its internal policies in letting him go).

Thus, even if Almodovar is able to demonstrate that Cross failed to follow its progressive discipline policy at trial,[12] she would also need to introduce facts into the record upon which a reasonable jury could "infer that [Cross' decision to deviate from its procedures was] motivated by" discrimination on the basis of her race, national origin, or gender. Bunting, 2016 WL 5799291, at *6. The court concedes that whether or not she has met her burden is a close call. For instance, Almodovar has conceded that she "never complained of any treatment that she believed to be discriminatory" while she was employed, nor did "[h]er co-workers . . . make any comments to her that she perceived to be discriminatory." Def.'s R. 56(a)1 Stmt at ¶ 11; Pl.'s R. 56(a)2 Stmt at ¶ 11. Although she did testify to her belief that the comment about her jeans, failure to put her name on the website, and failure show her the new office space were all discriminatory, "a plaintiff's mere subjective belief that [s]he was discriminated against does not sustain a . . . discrimination claim." Def.'s Ex. A, Dep. of Jeannette Almodovar, Vol. II, at 24; Boza-Meade v. Rochester Housing Auth., 170 F. Supp. 3d

---

[12] Cross also argues that it has not failed to follow its progressive discipline policy because that same policy expressly states that "the company reserves the right to combine, skip or add steps to the disciplinary system on a case-by-case basis" and that, "[w]hen warranted, the company may terminate the employment relationship without prior notice or disciplinary action under [the] policy." See Pl.'s Ex. 4; see also Def.'s Reply at 3-4.

Construing the facts in the light most favorable to Almodovar, however, a reasonable jury could conclude that Cross did fail to apply its progressive discipline policy to her. Therefore, the court need not further address this argument here.

535, 554 (W.D.N.Y. 2016) (internal quotations and citations omitted) (concluding that, even if plaintiff's transfer to another department constituted an adverse employment action, her claims would still fail because they were "not supported by anything other [than] her own conclusory assertions that she was discriminated against on the basis of her race and national origin"); see also Lue v. JPMorgan Chase & Co., 768 F. App'x 7, 10 (2d Cir. 2019) (affirming summary judgment on an employment discrimination claim because "[a]lthough the evidence show[ed] that [plaintiff] repeatedly complained that defendants' actions were discriminatory, no other evidence in the record supports a racial motivation"); Fasoli v. City of Stamford, 64 F. Supp. 3d 285, 311 (D. Conn. 2014) ("although the Court does not dispute [plaintiff's] sincerity in claiming that Defendants, inter alia, unlawfully retaliated against him, subjective belief does not, as a matter of law, constitute objective evidence").  In contrast, "evidence of remarks by [an] employer reflecting discriminatory motive [would be] sufficient to raise[ ] a triable issue as to whether the articulated reasons for [the employer's conduct] were pretextual."  Williams v. Quebecor World Infiniti Graphics, 456 F. Supp. 2d 372, 384 (D. Conn. 2006) (internal quotations and citations omitted).  However, there is no evidence of any such comments here.  Instead, she points to the differential treatment received by Porter and to Cross' vague and subjective reasons for her termination.  It is to these issues that the court now turns.

        2.     Differential Treatment

Almodovar next argues that the different ways in which she and Porter were disciplined is also sufficient, standing alone, to infer pretext.  Pl.'s Mem. at 17-18.  "A showing that similarly situated employees belonging to a different [protected] group received more favorable treatment can also serve as evidence that the employer's

proffered legitimate, non-discriminatory reason for the adverse job action was pretext for discrimination." Graham, 230 F.3d at 43 (emphasis added). In Graham, the Second Circuit found that the issue of pretext was a question of fact for the jury when the plaintiff had introduced evidence upon which the jury could conclude that two similarly situated white employees "who also tested positive for drugs or alcohol received multiple last chance waivers while [plaintiff]", who was black, "was fired after being given only one." Id. at 41. Thus, the court concluded that "[w]ere a jury to find on these facts that there was disparate treatment in [defendant's] disciplining of plaintiff when compared to similarly situated employees, it could also find that [defendant's] proffer of a non-discriminatory reason for [his] dismissal was pretextual . . . . Only where overwhelming evidence exists that an employer acted for reasons other than discrimination will the proof submitted by the plaintiff as to similarly situated employees be negated."[13] Id. at 43-44 (emphasis added).

Of course, in Graham the plaintiff had come forward with evidence regarding multiple, similarly situated employees. Where, as is the case here, there is only a single similarly situated employee,[14] and the record is otherwise devoid of direct evidence of discriminatory intent, the Second Circuit has held that a plaintiff often needs something more upon which a reasonable jury can infer pretext. See Weinstock v. Columbia Univ.,

---

[13] It is worth noting that the Connecticut Supreme Court has "[found] Graham unpersuasive." See Perez-Dickson v. City of Bridgeport, 304 Conn. 483, 523 n. 43 (2012). However, the footnote in Perez-Dickson was related to the Graham court's use of circumstantial statistical evidence, rather than direct comparisons and, as such, is not directly applicable to the case at hand here.

[14] There is a substantial amount of jurisprudence regarding the standard for what makes employees "similarly situated." However, it is not necessary for the court to address that issue here, as the parties agree that Almodovar and Porter were similarly situated. See Pl.'s Mem. at 17 (arguing the two were "similarly situated account manager[s]"); Def.'s Reply at 1, 4-5 (discussing Cross' treatment of Porter in the context of how Brown "addressed similar performance issues with account managers" and at no point arguing that Almodovar and Porter were not similarly situated).

224 F.3d 33, 46 (2d Cir. 2000) (affirming the district court's grant of summary judgment on a Title VII gender discrimination claim for the university and holding that "[a] claim that a single, supposedly less qualified male received tenure in the hard sciences at Barnard does not signify sex bias because the record at best indicates a difference of opinion in evaluation of scholarly merit, and not gender discrimination aimed at Weinstock") (internal quotations and citations omitted).  In other words, where there is only a single comparator, and the record reveals that the parties have a different opinion of the performance of the two employees, a plaintiff will often need to bring forth additional evidence upon which a reasonable jury can infer that the employer's proffered reason for the adverse employment action was pretext for discrimination.

Lower courts have followed this lead.  For instance, in Setelius v. Nat'l Grid. Elec. Services LLC, No. 11-CV-5528, 2014 WL 4773975 (E.D.N.Y. Sept. 24, 2014), the court granted summary judgment on plaintiff's Title VII gender discrimination claim after observing that evidence of a single similarly situated employee in that case was not, by itself, enough for a plaintiff to establish pretext.  Setelius, 2014 WL 4773975, at *16. Even though "[p]laintiff ha[d] presented sufficient evidence that a reasonable jury could find that she and [another employee] were similarly situated in all material respects" but were treated differently, the court found that "there [was] insufficient evidence in the record to permit a rational inference that Plaintiff's termination was motivated at least in part by discrimination."  Id.  In doing so, the court surveyed case law in this Circuit to note that, "[i]n other cases where a plaintiff has successfully argued that an employer's articulated reason for different treatment of a comparator who allegedly engaged in similar conduct was simply pretext for discrimination, the plaintiff put forward some

evidence that supported the rational inference that the employer's conclusion was either false or so irrational or arbitrary as to permit an inference of discrimination, or evidence that the conclusion was motivated at least in part by discrimination." Id. at *17. Because plaintiff did "not offer any evidence of discriminatory motivation, not even evidence of implicit bias", the court granted the employer's motion for summary judgment. Id.; see also id. ("in the complete absence of any other evidence in the record to support the rational inference that discrimination was at least in part an explanation for the difference in treatment", plaintiff "cannot meet her ultimate burden of showing not merely that [the employer's] reasons for terminating her were pretextual, but that her termination was motivated, at least in part, by discrimination").

In reaching this conclusion, the district court in Setelius further commented on the delicate line between when differential treatment would be sufficient to infer pretext and when it would not. In Judge Brodie's view, when there are only one or two comparators, the key variable is not the raw number, but whether the comparator[s] were "so similarly situated that it would be rational to draw the inference that the only possible explanation for their difference in treatment was the only way in which the plaintiff and the comparators differed – with respect to their protected status." Id. Thus, "where the gap in conduct between a plaintiff and a comparator is so small that only one variable, discrimination, can reasonably explain the difference, courts have not required additional circumstantial evidence of discriminatory motivation to allow a plaintiff to meet her burden [and defeat summary judgment] . . . . However, where the gap in conduct is large enough that any number of explanations can explain the difference, it is reasonable to expect a plaintiff to put forward some additional evidence – however

slight – to tip the scales and make discrimination a more likely explanation than other equally possible nondiscriminatory explanations."  Id. at *18.  Applying this standard, Judge Brodie concluded in Setelius that, "[i]n the absence of any circumstantial evidence of discriminatory animus other than the differential treatment, the inference that the difference in treatment is attributable in part to discrimination would be based on speculation rather than on evidence or a rational inference."[15]  Id.

Of course, Setelius is not binding on this court.  However, the parties have not pointed to any controlling authority that clearly delineates the boundary between when differential treatment between a plaintiff and a single comparator is by itself sufficient at stage three of the McDonnell Douglas analysis to create a triable issue of fact.  Indeed, both the parties' arguments in this regard are unpersuasive.  Almodovar does cite to Graham in passing, but the other two Second Circuit cases she cites to are inapposite here because they pertain only to the prima facie stage and the standard for what makes a comparator similarly situated.  See Pl.'s Mem. at 18 (citing Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 95 (2d Cir. 1999) (finding that the plaintiff had failed to establish a prima facie case because the comparators were not actually similarly situated); Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 63 (2d Cir. 1997) (same)).

Cross' argument does not fare much better, as it rests on a fundamental misunderstanding of the standard at summary judgment.  Cross contends that

---

[15] In Senno v. Elmsford Union Free Sch. Dist., 812 F. Supp. 2d 454 (S.D.N.Y. 2012), the court did find that a single comparator was sufficient to present a question for the jury.  However, in that retaliation case, the court observed that a reasonable jury could conclude that plaintiff and his comparator had "engaged in comparatively serious conduct" and thus "deserved comparable discipline, [but] that failure to treat them similarly was due to retaliation for [p]laintiff having filed an EEOC complaint."  Senno, 812 F. Supp. 2d at 481.  That case – as Judge Brodie notes – is consistent with her framework because other than the EEOC complaint, the two individuals were nearly identically situated.  Setelius, 2014 WL 4773975, at *17.

Almodovar's "argument that . . . [Porter] was treated differently . . . ignores the actual testimony given by [ ] Brown that plaintiff and [ ] Porter were both treated the same way." Def.'s Reply at 4. That is true. At this stage, however, the court is required to credit Almodovar's testimony that she was not provided with any indication that her performance was deficient before she was terminated. That necessarily means discrediting Brown's contradictory testimony as it relates to the conversations he said that he had with Almodovar about her performance. Thus, construing the facts in the light most favorable to Almodovar, a reasonable jury could conclude that Porter was provided with verbal discussions and opportunities to improve her performance, while Almodovar was not, and was simply terminated without warning. Cross offers no case law grappling with the facts as construed in this manner.[16]

Still, the weight of the authority in this Circuit suggests that a single comparator is not sufficient, absent anything more, to defeat summary judgment. While it is undisputed that she and Porter were similarly situated and a reasonable jury could conclude that Porter was treated differently because she received notice of her performance deficiencies and was given the opportunity to improve, there is no <u>direct</u> evidence in the record pointing to a discriminatory reason for that difference. Nor were Porter and Almodovar so similarly situated that, in the words of Judge Brodie, "only one

---

[16] To be sure, Cross also points to undisputed facts in the record that "a different white female account manager was terminated after one month because of deficiencies and mistakes in her performance . . . in November or December of 2020 after one month of training." Def.'s Reply at 4-5. Cross uses this to support its argument that Almodovar was not treated differently from this other employee. However, the court agrees with plaintiff here that, "[g]iven the obvious incentive" for an employer, after a discrimination complaint is filed, "to take corrective action in an attempt to shield itself from liability, it is clear that nondiscriminatory employer actions occurring subsequent to the filing of a discrimination complaint will rarely be relevant as circumstantial evidence in favor of the employer." <u>Chuang v. Univ. of California Davis, Bd. of Trustees</u>, 225 F.3d 1115, 1129 (9th Cir. 2000) (internal quotations and citations omitted); Pl.'s R. 56(a)2 Stmt at ¶ 22 (citing <u>Chuang</u>).

variable, discrimination, c[ould] reasonably explain the difference." <u>Setelius</u>, 2014 WL 4773975, at 18.  Although the court credits plaintiff's argument that Porter's mistakes were "real" and serious, Pl.'s Mem. at 17, they were somewhat different in kind than the errors Brown says Almodovar was making.  <u>See</u> Aff. of Tim Brown at ¶¶ 5, 7 (describing Porter's issues as problems with phone communications with clients and typos in emails, and Almodovar's as making mistakes and errors in providing information to customers, poor communication, failing to document communications, and errors in processing matters and being timely in responding to client requests).  Thus, the court concludes that different ways in which Almodovar and Porter were treated falls short of being by itself sufficient for a reasonable jury to conclude pretext.

        3.    Vague and Subjective Reasons for Termination

Third, Almodovar argues that, because Brown's testimony regarding his reasons for terminating her was "vague and subjective", that is alone sufficient "evidence of pretext."  Pl.'s Mem. at 18-20.  She does not point to any cases from this Circuit in support of this argument.  Here, the court again concludes that this factor is not sufficient, standing alone, to defeat summary judgment.

The out-of-Circuit case to which Almodovar cites is instructive.  In <u>Kimble v. Wasylyshyn</u>, 439 F. App'x 492 (6th Cir. 2011), the court did observe that "[t]he more subjective [an employer's decision], the more closely [a court] must scrutinize [its] proffered rationales."  <u>Kimble</u>, 439 F. App'x at 497.  However, the court only determined that summary judgment was not warranted on plaintiff's race discrimination claim after noting that reasonable jury could also find that: (1) plaintiff's job application had been rejected before it was even seen, while two other Caucasian employees were encouraged to apply "despite their professed inability to meet posted job requirements";

25

(2) a human resources manager drafted a letter of interest for another white employee and arranged for him to meet with the hirer while not doing the same for plaintiff and only forwarding along his application at the last second before the deadline, despite him having had submitted it the day the application opened; (3) plaintiff was the only applicant to meet the listed requirements of the job; (4) part of the employer's proffered reason for not hiring plaintiff was based on criteria that was not part of the job description, and; (5) the employer had not considered that criteria at all in hiring for the position previously.  Id. at 497-500.  Upon this record, the court did not conclude that the fact that the employer's proffered reason was subjective was alone enough to preclude summary judgment.[17]  Rather, it held that "[t]he totality of the evidence . . . casts doubt upon [the employer's] professed hiring rationale" and would allow a reasonable jury to conclude "that the reasons offered . . . were only a pretext hiding a discriminatory motive."[18]  Id. at 500-01.

Thus, the primary case Almodovar cites to in support of her conclusion that subjective reasons for an adverse employment action are themselves sufficient to show that the employer's proffered reasons were a pretext for discrimination does not in reality go that far.  Having examined each of Almodovar's first three arguments and

---

[17] The court did say in its conclusion that "each of [plaintiff's] assertions regarding the Department's handling of his application can suffice individually to thwart a defendant's proffered rationale."  Id. at 500.  However, the subjective nature of the employer's proffered reason was not one of the "assertions" the court said could be sufficient standing alone.  Id.  Rather, that was but one factor in the court's analysis of plaintiff's claim that he was "pre-rejected" from the job.  Id. at 497.

[18] The Circuit also observed that Kimble "involves a detailed fact pattern and highly particularized allegations, frustrating our attempts to find perfectly analogous case law."  Id. at 500.  It therefore follows that it would be difficult to apply Kimble to future cases as well.

found them insufficient to demonstrate pretext standing alone, the court now turns to the record as a whole.

4.    The Totality of the Record

The Second Circuit has been crystal clear that, in employment discrimination cases such as the one at hand here, "a court should examine the record as a whole, just as a jury would, to determine whether a jury could reasonably find an invidious discriminatory purpose on the part of the employer." Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 102 (2d Cir. 2001).  The corollary of this is that a district court errs if it fails to consider the record as a whole and instead "view[s] each piece of evidence in isolation." Friedman v. Swiss Re Am. Holding Corp., 643 F. App'x 69, 72.

After meticulously reviewing each piece of evidence before it and considering the record as a whole, the court concludes that a reasonable jury could add together the evidence discussed above and conclude not only that Cross' proffered reason was false, but also "that discrimination was the real reason h[er] employment was terminated." Phalon, 2021 WL 4477404, at *9; see also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993) ("a [proffered] reason cannot be proved to be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason") (internal quotations omitted) (emphasis in original).  Again, this case presents a close question.  The record is entirely devoid of any direct evidence of discriminatory animus.  Almodovar has not pointed to even a single isolated incident of someone at Cross doing or saying anything directly related to her race, national origin, or gender.  Indeed, she has conceded the opposite, that neither Brown nor her "co-workers . . . [made] any comments to her that she perceived to be discriminatory." Def.'s R. 56(a)1 Stmt at ¶¶ 11-12; Pl.'s R. 56(a)2 Stmt at ¶¶ 11-12.  To be sure, she

27

points to instances such as the comment about jeans and failure to add her photo to the

website or show her the new office space that she believes were discriminatory, but

"subjective belief does not, as a matter of law, constitute objective evidence."  Fasoli, 64

F. Supp. 3d at 311.  In this way, a reasonable jury could conclude that Almodovar's

claim is similar to that of the plaintiff in Setelius and find that she has "not offer[ed] any

evidence of discriminatory motivation, not even evidence of implicit bias."[19]  Setelius,

2014 WL 4773975 at *17.

That is not the end of the story, however.  Indeed, even in the absence of direct,

"smoking-gun" evidence of discrimination, courts in this Circuit have denied summary

judgment where there were multiple pieces of strong circumstantial evidence upon

which a jury could infer discrimination.  For instance, in Rodrigues v. Conn. Container

Corp., No. 3:20-CV-00294, 2022 WL 844610, at *5-7 (D. Conn. Mar. 22, 2022), this

court denied summary judgment in a disability discrimination case after finding that the

combination of: (i) the employer's failure to follow internal policies; (ii) a strong temporal

proximity between plaintiff's disclosure of his disability and his termination, and; (iii)

---

[19] Indeed, when assessing the record as a whole, courts in this Circuit have often required at least some indicia of objective, non-circumstantial evidence upon which a reasonable jury could conclude that discrimination played some role in the adverse employment action.  See, e.g., Friedman, 643 F. App'x at 72 (observing that the district court had failed to consider the record as a whole and finding plaintiff's case was "sufficient to survive summary judgment" because not only had he been replaced by a younger, less-qualified employee, but, inter alia, "he bolstered his case with evidence of ageist comments by superiors"); Danzer v. Norden Systems, Inc., 151 F.3d 50, 56 (2d Cir. 1998) (holding that, while "'stray remarks' alone do not support a discrimination suit", when combined with "other indicia of discrimination . . . the remarks can no longer be deemed 'stray', and the jury has a right to conclude that they bear a more ominous significance"); Lewis v. Am. Sugar Refining, Inc., 325 F. Supp. 3d 321, 352 (S.D.N.Y. 2018) (upholding a jury verdict for plaintiff in a racial discrimination case when plaintiff, who was black, had testified a superior had "use[d] the phrase 'you people'", which "he understood it to mean the 'n word'", and that understanding of the superior's meaning was corroborated by another witness); Setelius, 2014 WL 4773975, at *16 (granting summary judgment despite evidence of a similarly situated co-worker being treated differently because "there [was] insufficient evidence in the record to permit a rational inference that [p]laintiff's termination was motivated at least in part by discrimination").

disputed issues of material fact as to his job performance could allow a jury to infer

pretext.  Similarly, here a jury could credit Almodovar's evidence and infer pretext given

that: (i) the progressive disciplinary system was not followed; (ii) she was treated

differently than Porter, and; (iii) she was never told that her performance was deficient

before she was terminated.  See also Corona v. Clarins U.S.A., Inc., No. 17-CV-4438,

2019 WL 4393082, at *7-8 (S.D.N.Y. Sept. 12, 2019) (denying summary when there

were disputed issues of fact as to plaintiff's performance; there was evidence of

disparate treatment; and the company ignored its internal processes in terminating her).

 Thus, despite the lack of direct, objective evidence of discrimination, a

reasonable jury could still conclude that Almodovar was treated differently than Porter;

was not provided with the opportunity to improve her performance through the

progressive discipline policy; and, indeed, was not even told that she was not

performing adequately until the day she was terminated.  A reasonable jury could piece

together this evidence – along with other incidents Almodovar points to, such as the

meeting with Cluett and Bova where they questioned her 9:30 A.M. start time – and

infer that Cross' proffered reasons for terminating her were pretextual.

 Thus, because a jury could weigh the totality of the record and infer that Cross'

proffered reason was a pretext for discrimination on the basis of race, national origin, or

sex, the Motion for Summary Judgment is denied.

**V. CONCLUSION**

 For the reasons discussed above, the Motion for Summary Judgment (Doc. No.

25) is denied.

**SO ORDERED.**

Dated at New Haven, Connecticut this 2nd day of June 2022.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge